HINTON BROS. LUMBER CO. *v.* POLK.

[78 South. 179, In Banc.]

MASTER AND SERVANT. *Injuries to servant. Evidence. Cause of injury.*
Under the facts in this case, which was a suit by a servant against
his master, for injury sustained by the master's failure to fur-
nish him a safe place in which to work, the court held that
plaintiff's injury resulted not because he was furnished with
an unsafe place in which to work but for the reason that he
placed himself in a dangerous position not called for by his work,
in order to discharge a duty incumbent not upon him, but upon a
fellow employee.

APPEAL from the circuit court of Lamar county.
HON. A. E. WEATHERSBY, Judge.

Suit by J. R. Polk against the Hinton Bros. Lumber
Company. From a judgment for plaintiff, defendant
appeals.

Appellant is a corporation engaged in the manu-
facture of lumber, and appellee was one of its em-
ployees, who was injured, as he alleges, because of ap-
pellant's negligence. In connection with appellant's
other machinery it operates a planing mill in which
there are six planing machines for the dressing of
lumber after it has been sawed. These machines are
placed in a line with and at a distance of ten to fifteen
feet from each other. Behind these machines and
running at right angles therewith is a "lumber run,"
about ten feet wide, consisting of three two-inch
"turtle back" steel chains. These chains run either
in grooves or on top of the floor, which does not clearly
appear from the evidence, and move slowly forward
and convey the lumber, after it comes from the planers,
to the grader pit, where it is assorted, and then con-
veyed to other portions of the building. The floor,
between each of these planing machines and the first

chain, and then continuing across the lumber run be-
tween each of the chains, is covered with a strip of
sheet iron or tin twenty-four inches wide.  This tin
or sheet iron slopes on each side of the chains, so as
to bring the ends thereof next to the chain about on a
level therewith.  There was an open space between each
planer and the lumber run, and also on the side of
the lumber   run   opposite   the   planers,   on which
employees could   stand   while   keeping   the lumber
from becoming tangled when being conveyed by the
lumber run.  The lumber, as it came from the planing
machines, was shoved across the lumber run; and this
tin or sheet iron was placed there for the purpose of
enabling this to be accomplished without the lumber
being obstructed by the chains, but in the cross-ex-
amination of appellant's foreman appear the follow-
ing questions and answers:

"Q.  That chain is kind of an oval shape isn't it;.
and the side where the lumber strikes it comes down
on an incline this way?  A.  Yes, sir.  Q. It is fixed
that way so that the lumber would push over on the
chain?  The purpose of fixing it that way was so that
the lumber would push over the chain in event that it
didn't happen to have that tin there?  A.  Yes, sir.
Q.  So that it would just slip over there, whether it
had a tin or not, that was the purpose of it?  A.  Yes,
sir."

. These strips of sheet iron, because of the continual
passing over them of the lumber, soon became very
slick.  The lumber, unless kept straight by employees
stationed at the run for that purpose, while being con-
veyed thereon would become tangled and would drift
into piles.  Two employees were stationed at the run,
one on each side thereof, for that purpose.  Two of
these planing machines were equipped with tilting
tables; that is, with a board extending from the ma-
chine and across the lumber run and so adjusted that
when a piece of lumber was shoved from the planer

thereon it would tilt automatically and place the lumber across the run. Appellee had been employed by appellant for some time, and seemed to discharge whatever duties appellant's foreman imposed upon him. On the occasion in question he was directed by the foreman to take the place of one of the men stationed at this lumber run and assist in keeping the lumber straight thereon. While so engaged, the man working with him on the opposite side of the run left temporarily, and, while he was away, the lumber became tangled on his side of the run—that is, on the side opposite that on which appellee was stationed—whereupon appellee walked across the chains for the purpose of straightening the lumber, and stepped upon the sheet iron, slipped thereon, fell and was injured. The circumstances surrounding the accident can best be stated in appellee's own language in answer to questions propounded to him by counsel:

"Q. What were you doing at the time you received your injury? A. I was straightening the lumber there in Mr. Crook's place. It takes two men there, and he wanted to step aside, and I stepped up there to straighten it while he stepped to one side, and I had to go across the chain to where the lumber was crooked, and when I got up there where it was crooked, and straightened it, and looked back, it was crooked at the other end, and I started back, and when I went to turn my foot slipped, and I fell, and my hip hit the chain. Q. How come your foot to slip? A. I stepped on that tin, and it was just as slick as it could be, and my foot slipped out from under me, and I fell and hurt my hip. Q. Tell the jury whether you could have gotten to that lumber to have moved it without stepping on that tin. A. Not on that side of it. Q. Tell the jury whether that was the side you were required to work on. A. Well, I was assisting for the other man down there. That was not my side, but it was crooked up there, and nobody there to attend to it, and I had to go across there,

and I had to cross on that tin on the way across. There was no other way of getting across there without going way around out of my way, and I didn't have time to do that . . . Q. Now from the place where you stepped and slipped, you could have stepped about two steps and got out on the floor and went down to that, couldn't you, by taking about two steps out of the way? A. No, you see I had to run in there between the two chains. Q. Well, you could have stepped out there to the edge and walked down and walked back in, couldn't you, by just walking a little more? A. Yes, by taking some time I could. Q. By taking about one step that way and going down one and back one you could have gotten to it without crossing there? A. I could have by going way out of the way. . . . Q. Now you say there was another fellow whose duty it was to straighten the other side? A. Yes, sir; it was my place to straighten it out on one side, and he was on the other. Q. Did Mr. Hubert (appellant's foreman) tell you to take both of those fellows' places? A. No, he didn't tell me to take their places, but that lumber was tangled, and there was nobody there to untangle it. He sent me there to take Mr. Crook's place. Mr. Sam Slade's son, Steve Slade, was on the other side. Q. So the lumber that you went to straighten out was on Mr. Slade's side where he worked? A. I had been there, and had straightened that out, and started back to straighten mine. Q. How come you over there, though, was to do the Slade boy's work? A. There was nobody over there to do it, and it was going to get to the grade crooked. Q. Now Mr. Hubert didn't tell you to do Slade's work too, but he just sent you to take Crook's work? A. Yes, sir; I asked him, 'Must I take Mr. Crook's place?' and he said, 'Yes.' He didn't tell me to take Mr. Slade's place, but of course he would have it to do; it was all tangled up, and there was nobody there to untangle it and get it straight. A. But he didn't tell you to take Slade's

place; he told you to take Crook's? A. Yes, sir. Q. And you had often, you say, taken that man's place? Had you ever taken Slade's place before—I mean when you were working there in their places? A. I don't recollect exactly about taking Mr. Slade's place, but I have taken the places of the boys working there. Q. In other words, you have worked all along that chain? A. Yes, sir. . . . Q. While you were working in Mr. Moran's place you would have to take the others' places often also? A. Yes, sir; nearly every day. A great many times I did. That was not the first time I had took that job for Mr. Crook and the others there. I had been helping them ever since I had been there. Q. So that job, so far as the job was concerned, was not a new job to you? A. No, sir. Q. And the lumber would get crooked, and you would have to straighten it often—that was your business when you were holding that job? A. Yes, sir. Q. And if it got crooked on the side where you were you could straighten it there? A. Yes, sir. Q. But if it tangled up over across there on the other side you would have to go across over there? A. Yes, sir; but when there were two men one was on each side, but when one man stepped off if it got crooked the other man would have to step across there. Q. You had crossed those chains before? A. Yes, sir. Q. Because it would get crooked there often? A. Yes, sir; whenever it would get crooked I would go over there and straighten it.''

*Salter & Hathorn* and *Welch & Welch,* for appellant.

*Hall & Hall* and *J. W. Cassedy,* for appellee.

Smith, C. J., delivered the opinion of the court.

(After stating the facts as above). The negligence with which appellant is charged is that it failed to furnish appellee with a safe place in which to work, but it

seems clear from the evidence that there is no sort of merit in this contention. Appellee's injury resulted, not because he was furnished with an unsafe place in which to work, but for the reason that he placed himself in a dangerous position, not called for by his work, in order to discharge a duty incumbent not upon him, but upon a fellow employee. Moreover, the sheet iron was not intended to be used by appellant's employees as a passageway across the lumber run, but, on the contrary, their duties required that they should keep off of it, so that it might serve the purpose for which it was intended; that is, to facilitate the passage of the lumber from the planing machines across the run. The peremptory instruction requested by appellant should have been given. Reversed, and judgment here for appellant.

*Reversed.*

HOLDEN, J. (dissenting). I differ with the majority on the one decisive question in this case, and that is, whether or not the testimony shows that the master failed to furnish the servant with a reasonably safe place in which to work, or whether or not the evidence was, at least, sufficient to justify the court in submitting this question to the jury. The appellee was injured while performing the duties of his employment. It is true that, at the time he was injured, he was serving in the place of another employee who had stepped aside, but the record shows that it was his duty to do this, and was employed for that purpose. His employment required him to handle the lumber on the moving chains, so that it would not become blocked and impede or stop the operation of the planing machines and chains. In order to do this it was necessary, and within the purpose of his employment, for him to walk across and over the chains and runway to straighten out the lumber which

had become blocked on the opposite side. While doing this, on the occasion in question, he noticed that the lumber was becoming blocked on the chains on the other side from which he had come, and he started back across to straighten it out, and, while crossing over, inadvertently stepped on the slippery sheet iron—which the testimony shows was as slippery as ice—and slipped and fell on the chains and was injured. That this slippery sheet iron was dangerous for a person to step on is conceded by the record. It is also true that if the sheet iron had been guarded it would have been useless for the purpose it was placed upon the floor. But the record also shows that the foreman of the appellant testified, in effect, that it was unnecessary to have this sheet iron on the floor at all, as the chains were "turtle back" in shape, and the lumber would pass over them without the aid of the sheet iron. The sheet iron had been worn to its dangerous, slippery condition by many years of use there on the floor; and its danger to employees working near and around it was known to the master. It is very evident that an employee working near it, as the appellee was, in the course of his duties, would be liable, at an unguarded moment, when his mind was engaged with his work, or in a moment of forgetfulness of its presence, to step upon it, even though he knew it was there, and that it was a dangerous place on which to step. This being true, it appears to me that, at most, the appellee could be charged only with contributory negligence in this case, which, of course, is not a bar to recovery. With the assumption of risk doctrine out of it, and contributory negligence being no bar to recovery, the question of negligence of the master, I think, was properly submitted to the jury by the lower court.

It is pertinent to inquire, What is a reasonably safe place in which to work? What is a reasonably safe place depends entirely upon the facts in each particular case,

and is a question of fact that should be submitted to the decision of a jury, unless the court can safely say from the bench that the proof shows manifestly and conclusively that the place furnished by the master to the servant in which to work is, or is not, reasonably safe.

Under the facts and circumstances of this case, I think the circuit judge was eminently correct in submitting the question to the jury as to whether or not, taking into consideration all the conditions, circumstances, character, and nature of the work of the servant, and the nature and location of the dangerous instrumentality which caused the injury, the master was negligent in failing to furnish the servant a reasonably safe place in which to work. It seems to me that the jury, composed of laymen taken from all walks of life, and who are familiar with ordinary human affairs of everyday life, would be the proper judges as to whether, under the particular facts and circumstances of the case, the place furnished by the master in this case was a reasonably safe place for the servant to work in. To say the least of it, it was a close question on the facts, and the judge could not say, as a matter of law, that the master was free of negligence.

When the opinion of the majority and appellee's testimony are read carefully and digested, it becomes obvious that the appellee is deprived of his recovery in this case merely because he was guilty of contributory negligence in stepping on the slippery sheet iron. This is wrong. The opinion is erroneous in two particulars (I quote), viz.:

"Appellee's injury resulted not because he was furnished with an unsafe place in which to work, but for the reason that he placed himself in a dangerous position not called for by his work in order to discharge a duty incumbent not upon him, but upon a fellow employee."

The injury received by the appellee was certainly caused by the unsafe place in which he was required to work. If the dangerous, slippery sheet had not been on the floor at the place around and about which the appellee was required to work, the injury would not have occurred. And whether or not it was a reasonably safe place must be judged by all the facts and circumstances, together with the nature of the work appellee was required to do, and also the deceptive appearance of the slippery sheet iron and the location of it on the floor, at a place where he would be liable to step upon it in the hurry necessary in performing the work that he was required there to perform. For that reason it became a question of fact that was properly submitted to the jury to determine whether the place was reasonably safe in which to work. The statement in the opinion that "appellee placed himself in a dangerous position not called for by his work" is not borne out by this record. The testimony shows that he was relieving and doing the work of one of the absent employees when called upon by necessity to do so at the time he was injured, which it was his duty to do, and was customary for him to do. This employment necessitated his crossing over, near, and around this dangerous slippery sheet iron, which he might inadvertently step upon at an unguarded moment while in the discharge of his duties.

Of course, "the sheet iron was not intended to be used by appellant's employees as a passageway across the lumber run," yet it was put upon the floor at a place where the appellee, in the course of his duties, in crossing from one side of the runway to the other, would be liable to step on it, in a moment of forgetfulness, or when his mind was engaged with his work and he had no time in which to think, or else be compelled to walk around and out of the way in order to properly perform his duties in preventing the lumber from becoming blocked; which duty, if he had failed to per-

form, would have caused his discharge, for the reason
that his employment required him to act hastily and
promptly when necessary in order to keep the runway
chain going in the proper manner.

The location of the dangerous instrumentality here,
and the character and nature of the service required
of the appellee, has much to do with determining
whether the place was reasonably safe. If I concede
that the sheet iron was not in a defective condition,
still I think that the place was not reasonably safe on
account of the location of the sheet iron on the floor,
at a place where the servant was required to work
around and over it. A place in which a dozen circular
saws are running might be a reasonably safe place for
a servant to work in, if the saws are reasonably and
properly placed. But an unguarded running saw, slight-
ly protruding in and above the floor, around and over
which a servant would have to walk in performing
the duties of his employment, might not be a reason-
ably safe place in which to work, although it was neces-
sary for the saw to be where it was, and it was not
defective, and would be useless if guarded. Therefore
a reasonably safe place to work in depends upon the
facts showing the circumstances and conditions, charac-
ter of the work, and nature of the duties required of
the servant.

In this case the sheet iron was not slippery when it
was first put down, but years of wear had made it as
slick as ice. Its danger to persons stepping upon it
was known to the master. It appears from the record
that some of the employees working at similar machines,
where sheet iron was placed upon the floor, wore rub-
ber heels as a protection against slipping on these
slick sheets. The employer here knew of this fact and
understood that the kind of work required of appellee
was the same as required of the other employees work-
ing at other machines under similar circumstances.

The master also knew that the servant was liable to step on the slippery sheet while doing the kind of work that he placed him there to do, as the sheet was located at a place around and over which appellee had to perform his work. It was as dangerous to step on this slippery sheet iron as it would have been to have stepped into a hole in the floor located at the same place. And certainly the appellee would not be denied recovery had his injury been received on account of stepping in a hole or trap at the place where this slippery sheet was located on the floor. In Thompson on Negligence, vol. 4, section 3888, it is said:

"Duty of Master to Prevent or Guard Mantraps, Trapdoors, and Other Hidden Dangers on Such Premises.—This duty of the master extends to preventing the premises whereupon he requires the servant to work, from containing dangerous pitfalls, obstructions, or other mantraps, into which his servant is liable, unguardedly, to fall while his mind is absorbed in the duties of his employment."

When the facts of this case are carefully considered and the long-established rules of law with reference to the master furnishing the servant a reasonably safe place in which to work are applied, I have no serious doubt that the learned circuit judge was correct in submitting this case to the jury in the lower court. From the nature of the employment the appellee was compelled to work around and over a dangerous instrumentality, nearly in his pathway, and he was liable to step on it at an unguarded moment, while in the performance of the very duties of his employment, and thereby become injured. The jury, and not the court, were the sole judges of the facts, taking all the conditions, circumstances, and nature of employment into consideration, as to whether or not the master here was guilty of negligence in failing to furnish the servant a reasonably safe place in which to perform his duties.

The appellee is an aged man with a family, and was permanently injured. The recovery below is to be set aside and annulled and his action ended by the majority opinion of this court. I cannot concur in the view of the majority, and as the principle of law involved is important for the future, and as I do not think that, under the law, the appellee should be deprived of his recovery, I have written rather at length.

ETHRIDGE, J., concurs in this dissenting opinion.